IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CHARLES WHITE,

      Plaintiff,

      v.                                                  No.    CIV 12-00517 WJ-RHS

BRIAN SANCHEZ,

      Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANT'S SECOND MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendant Brian Sanchez' Second Motion for Summary Judgment, filed on January 28, 2013 **(Doc. 34).**[1] Having reviewed the parties' briefs and applicable law, I find that Defendant's is well-taken and shall be granted.

### BACKGROUND

This case pertains to a child abuse investigation involving victim, D.W., who is Plaintiff's son. The Amended Complaint alleges a single count of malicious prosecution against Defendant, pursuant to 42 U.S.C. § 1983. The investigation was conducted in September, 2006 by retired Albuquerque Police Department ("APD") Detective Brian Sanchez who interviewed witnesses, including Plaintiff. Plaintiff was ultimately charged, indicted and subsequently tried on child abuse charges. The case was tried before a jury and the jury acquitted Plaintiff.

After the conclusion of the criminal case, Plaintiff filed suit in the Second Judicial District Court of New Mexico and asserted a state law claim of malicious abuse of process

---

[1] The pleading is captioned as a "second" summary judgment due to the Court's striking of the parties' multiple pleadings and notices and errata. Doc. 31.

against Detective Sanchez.  The complaint was dismissed, according to Plaintiff, on statute of limitations grounds.  Pltff's Ex. 3.  Plaintiff then filed the present lawsuit in which he asserts a §1983 claim of malicious prosecution against Defendant Sanchez.  Defendant contends he is entitled to qualified immunity because there was probable cause for Plaintiff's arrest and prosecution.  Plaintiff contends that he was arrested for a crime he did not commit, based on Defendant Sanchez' misrepresentations and omissions stated in his affidavit.

I.      **Undisputed Facts[2]**

For purposes of this section, the Court has considered both parties statement of facts and the opposing parties' responses to those facts; Plaintiff's additional statement of facts and Defendant's responses to those facts.  The Court sets forth a chronological description of events here.  Facts which are not included herein are either considered to be extraneous or irrelevant to the analysis of Plaintiff's sole claim in this lawsuit; unsupported by the evidence; or mischaracterizations of the evidence which has been presented to the Court as exhibits.  The relevant facts in this case are not disputed, but rather the legal significance of those facts.

The initial facts presented here are taken from Plaintiff's statements during his police interview by Defendant Sanchez, and Defendant does not dispute that these statements were made by Plaintiff.  The Court has also viewed the DVD which Defendant has submitted as Ex. H to the brief-in-chief, which shows Plaintiff's interview by Officer Sanchez.

Around 5:30 p.m., on September 3, 2006, Plaintiff went to dinner at his in-laws with his wife Anne White.  They left the in-laws' house between 7:30 p.m. and 8:00 p.m.  Plaintiff lifted his infant son D.W., who was still in his car seat, out of the vehicle and took him inside.  Shortly thereafter, Plaintiff decided to feed D.W.  He picked up his son and brought him near to

---

[2] The facts set forth herein are undisputed, unless otherwise noted, and the facts cited to here are supported by the parties' exhibits.  Plaintiff uses numbers to designate exhibits, while Defendant uses letters.

2

his shoulder.  He noticed that the baby's breathing was "raspy," which he thought was related to mucus build-up that D.W. had been treated for previously.  Plaintiff took his son into the kitchen to prepare a bottle.  Suddenly, D.W.'s body "flopped backwards" and the child went limp.  Plaintiff went into the living room and immediately told his wife to call 911 because the baby appeared not to be breathing.  Plaintiff began administering mouth-to-mouth resuscitation to his son.  The baby was transported by ambulance to Presbyterian Hospital in Albuquerque, New Mexico, and was examined by Dr. Michael Shannon upon arrival.

At 11:48 that evening, Defendant Sanchez was informed by APD Police Officer Max Miranda that a seven week old infant (D.W.) had been transported to Presbyterian Hospital because the infant had stopped breathing.   Defendant Sanchez proceeded to the hospital and was told by the "hospital staff" that the infant had a subdural hematoma, brain swelling and retinal hemorrhages. Ex. E at 9:22-25.  Parties dispute about exactly what information was relayed to Defendant Sanchez regarding the age of the injuries, particularly the rib fractures and subdural hematoma.

A.      Plaintiff's Statements During Interview

Plaintiff was interviewed by Detective Sanchez and a female detective[3] and was read his *Miranda* rights at the beginning of the interview (referred to by Plaintiff as an "interrogation").[4] In fact, Defendant Sanchez and the female detective who assisted in the interview went above and beyond what is required by *Miranda* in terms of making sure Plaintiff understood his *Miranda* rights.

During the interview, in first describing what happened, Plaintiff stated that D.W. was lying in his arms and then flopped backward and was pretty limp.  Plaintiff started "rocking him

---

[3]  The Court understood the female detective's first name to be "Karen" but could not ascertain from the DVD recording the detective's last name.

[4]  *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

a little bit." Ex. G at 27:1-19.   As the interview progressed, Plaintiff became more aggressive as to how he demonstrated what had occurred.   Plaintiff later changed his story and said: "The only thing that happened was when I picked him up, he cried. I pulled him in real close and I hugged him real hard.  I might have been too tight with him. . . But that's it.  I didn't do it, I did not grab him. I did not shake him.   I did not do . . . anything else.  I held him real tight."   Ex. G at 39:9-18; Ex. H at 40:21-40:46.   Detective Sanchez asked Plaintiff if he "squeezed him hard enough to do something to the ribs.  Would that be a fair assumption?"   Plaintiff responded "Yes."  Ex. G at 44:9.

Later on in the interview, Plaintiff said, "I pulled him too hard to me.  When I picked him up out of the [sic] his crib. . . out of his thing, and he cried and he wiggled.  I grabbed him and I pulled him hard to me so I could . . . so that I could protect him.  And when he . . . when he started kicking and wiggling when I picked him up, I pulled him hard to me and it must have been when he hit my . . . my shoulder here." Ex. G. at 59:6-15.

Plaintiff later changed the story again, admitting that he "probably squeezed him too hard, especially as he's been getting weaker and frailer. . . "   Ex. G at 43:2-4; Ex. H at 45:09-45:18.  Still later, Plaintiff stated that he did shake D.W. :

> . . . after I pulled him so hard up against me with his. . . if his head snapped back and forth. Yes, I mean, I. . . I pulled him up hard to me. . . And then when that happened, yes, could I have shook him pretty hard out of it trying to see what was . . . what was wrong.

Ex G at  74:10-19.  When Detective Sanchez asked Plaintiff to confirm if he could say 100% whether he did grab the baby tight and whether he did shake the baby in some sense, Plaintiff responded:  "Yes." Ex. G  at 75:4-9.   Defendant Sanchez asked whether D.W.'s head wobbled like a bobble head doll when Plaintiff pulled D.W. towards him, and Plaintiff responded, "Yes.  I want to say, yes.  It could very well be that way.  I guess to an extent, you're right.  I'm not

4

remembering some of it.  I'm . . . I'm wanting to put away.  I grabbed him.  He started . . . I pulled him hard to me and . . . And I hurt my baby." Ex. G at 71:17-72:6.

Plaintiff told Defendant Sanchez that he and his wife were the baby's primary caregivers. There was some discussion during the interview about whether Plaintiff's ex-wife, Anne White (who was then Plaintiff's wife) could have caused D.W.'s injuries.  When Plaintiff was asked if he believed that Ms. White caused the injuries, he responded "I did not cause "*all* of them." Ex. G at 42:24-43:2.

B.  Defendant Sanchez' Alleged Misrepresentations and Coercive Statements

Plaintiff does not dispute that he made the above statements during the interview. Instead, he claims that they were made in response to Defendant Sanchez' misrepresentations or mischaracterizations of the medical evidence which (according to Plaintiff) indicated that the injuries which D.W. had sustained were old and thus Plaintiff could not be responsible for them. Thus, Plaintiff contends that his responses and admissions during the interview were not true because they were based on misinformation supplied by Defendant.   For example, Defendant told Plaintiff:

- "Your son has five broken ribs, possibly seven broken ribs.  Your son, he's not in good shape.  He has severe bleeding on his brain, a possible skull fracture.  Some of these injuries are old injuries.  Some of them are relatively new injuries." Ex. G at 30:1-5;

- "these injuries cannot happen accidently" and that "they are consistent with shaken baby--the ribs being broken, the bleeding around the brain."  Ex. G  at 36:10-14; and that "[w]e have some old bruising.  I haven't even gotten on that yet. Okay.  We have some old bruising, too . . .  have a doctor saying that the—some  of these broken bones are within 7 to 12 days old."  Ex. G at 67:10-16.

Defendant Sanchez made other statements to Plaintiff during the interview which elicited Plaintiff's successively modified accounts.   When discussing D.W.'s injuries, Defendant Sanchez stated:

5

> Something happened. And like I said, I've been doing this for an awful long time. Something happened from the time you got home from dinner 'til the ambulance was called. I know that. . . Something happened in that small time frame from when you got that car seat out and got into the house, short little window there, but your mind don't want to, doesn't want to think you did that, and I, I know that for a fact, I know that for a fact. So you try to help us out so we could try to help this kid out.

Ex. 2 at 32:12-21.[5]   Defendant Sanchez also told Plaintiff during the interrogation:

> And, and, and but the thing about it is, it was a short period of time, I know that. Okay. I, I'm able to establish that whatever happened from the time you grabbed him from the car seat and you grabbed him and you squeezed him, you know, what I think happened is when, when you squeezed him and you see him, and you look at him, you're like, what did I do, that, I think that's the first, what I agree with. Would that be a fair statement?  You grab him, you squeeze him, you're sitting there after everything's said and done you let him go, and wow – what did I do.  And, the human instinct is to try and correct their mistake, you know, and like I said, well, we've been doing this for a while and actually I've been in this, with someone in the exact same situation as you, and everything is very similar to what you're telling me, very, very similar.  And what happens is, okay, the shaking might have started off, are you alright, are you alright, what'd I do, and at one point it gets more and more violent.  Wouldn't you say?  You know, 'cause you, your kid is not responding the way that you were used to him responding. . . You know, and you're in a panicked state of mind. You know, I will be the first to say, you know what, if something like that happened I would freak out, I would be, what the hell did I just do, I didn't mean to do this to him, what did I do, what did I do, how do I get my baby up now, how do I get him normal again, how do I help him, and, and the first instinct is to try and shake him up, wake him up.  You know, and the think about it is it was a violenter [sic] shake than your [sic] saying, I know that.  Okay?

Ex. 2 at 55:17-56:17.   Plaintiff responded, "Maybe I, I mean, I don't know. . . I can't I'm not going to be able to tell that. . . is this hard or that hard."   Ex. 2 at 56:19-57:2.

C.   Plaintiff's Arrest

After talking with the doctors at Presbyterian Hospital, Defendant Sanchez completed an affidavit for an arrest warrant.   After he filed his arrest warrant affidavit, Defendant testified to the grand jury.  During his grand jury testimony, Defendant Sanchez testified that Plaintiff had

---

[5]  Plaintiff also refers to a statement Defendant Sanchez made to Plaintiff "comparing" Plaintiff to a child molester and murderer.  Doc. 38 at 16, fact 25.  However, Plaintiff grossly mischaracterizes Defendant Sanchez' statement, since Defendant Sanchez was clearly *distinguishing* Plaintiff from a child molester, *not* comparing him to one ("I don't see that in you.  I don't see that at all.").

6

stated that he "grabbed [D.W.] from the car seat in an extremely rough manner." Ex. 11 at 11:4-7. At trial, Defendant Sanchez admitted that this statement was not a verbatim representation of Plaintiff's statements to him. Ex. 12 at 14:3-15:12.

Plaintiff was indicted for child abuse resulting in great bodily harm. He spent forty-five days in jail and later was required to wear an ankle bracelet prior to trial. He also temporarily lost custody of D.W. Plaintiff now has permanent and full custody of D.W., and Ms. White's visitation rights have been terminated. She faced criminal charges for abandonment and cruelty to children.[6]

A jury acquitted Plaintiff of all charges in May 2009.

**II.    Legal Standard**

The doctrine of qualified immunity shields government officials performing discretionary functions from liability for civil damages if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Prager v. LaFaver*, 180 F.3d 1185, 1190 (10th Cir.1999) (internal quotations omitted). Plaintiff must demonstrate (1) that the law was clearly established when the alleged violation occurred, and (2) that defendant's alleged conduct violated the law. *Dixon v. Richer*, 922 F.2d 1456, 1460 (10th Cir.1991). To demonstrate that the law was clearly established, Plaintiff must show that the alleged unlawfulness of Defendant Sanchez' conduct was apparent in light of preexisting law. *Armijo v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1260 (10th Cir.1998). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (internal quotation omitted). Plaintiff has the burden to establish that "the asserted right's contours are sufficiently clear such that a reasonable official would

---

[6] An incident report presented as evidence by Plaintiff states as the basis for the charge that Ms. White "intentionally deprived [D.W.] of prescription formula necessary for his survival." Ex. 13.

understand that what he is doing violates that right." *Id*. (internal quotation omitted). If Plaintiff meets her burden of showing that Defendant Sanchez' conduct violated clearly established law, then Defendant "bears the burden, as a movant for summary judgment, of showing no material issues of fact remain that would defeat the claim of qualified immunity." *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir.1995).

## DISCUSSION

The gravamen of Plaintiff's argument is that Defendant Sanchez knew that Plaintiff's admissions during the interview were not true, based on the medical evidence. Plaintiff also claims that the arrest warrant was based on misrepresentations contained in the warrant affidavit, and that Defendant Sanchez omitted exculpatory evidence in order to initiate criminal proceedings. In addition, Plaintiff contends that Defendant false testified before the grand jury and failed to present evidence that conclusively demonstrated that Plaintiff did not abuse his son.

**I.      Law on Malicious Prosecution**

A § 1983 malicious prosecution claim includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. *Novitsky v. City of Aurora*, 491 F.3d 1244, 1258 (10th Cir. 2007) (citing *Pierce v. Gilchrist,* 359 F.3d 1279, 1291-97 (10th Cir. 2004). In the Fourth Amendment context, the issuance of an arrest warrant can initiate the legal process to trigger a malicious prosecution claim. *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). The issuance of a grand jury indictment can also initiate the legal process to trigger a malicious prosecution claim. *See Pierce v Gilchrist*, 359 F.3d 1279 (10th Cir. 2004).

The focal point for claims of wrongful arrest, detention, and prosecution under § 1983 is whether there is probable cause supporting Plaintiff's arrest. *See Grubbs v. Bailes*, 445 F.3d 275, 1278 (10th Cir. 2006). This case turns on whether probable cause existed for the issuance of the arrest warrant. Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense. *Romero,* 45 F.3d at 1476. Probable cause does not require a finding of guilt beyond a reasonable doubt, nor does it require proof of a prima facie case. *See St. John v. Justman*, 771 F.2d 445, 448 (10th Cir. 1985). Rather, probable cause requires a "substantial probability that a crime has been committed and that a specific individual committed a crime." *Id*. Whether probable cause exists in light of the factual record does not rest on proof beyond reasonable doubt, nor does it even require the suspect's guilt to be "more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535 (1983); *see also United States v. Ludwig*, 641 F.3d 1243, 1252 (10th Cir. 2011). Probable cause for an arrest warrant is established "by demonstrating a substantial probability that a crime has been committed and that a specific individual committed the crime." *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996).

This law is relevant to Plaintiff's claim, and was clearly established at the time Defendant testified in his affidavit, and at the time a warrant was issued for Plaintiff's arrest.

**II.     Analysis**

Plaintiff's arguments can be divided into three categories, all of which challenge the legal integrity and basis for the arrest warrant.

A.     <u>Defendant's Grand Jury Testimony</u>

Plaintiff's argues that Defendant Sanchez' statement to the grand jury that Plaintiff had grabbed D.W. from the car seat "in an extremely rough manner" was not true, and because of

9

this statement, the grand jury was misled into returning an indictment.  Defendant Sanchez later acknowledged in an interrogatory (Ex. J) that he should not have stated to the grand jury that Plaintiff made this statement verbatim.   Defendant should have made it clear to the grand jury that this description came from his own interpretation of Plaintiff's words and description of his own conduct during the interview.

It is undisputed that Plaintiff actually stated that he pulled D.W. "too hard" when he picked him up out of the carrier, and that D.W. cried when he did so.  Also, during the interview, Plaintiff demonstrated physically how he removed the baby from the carrier.  Based on the Court's own review of Plaintiff's own statements and the demonstration on the DVD, the Court agrees with Defendant that his statement reasonably and accurately paraphrased the various statements Plaintiff gave over a period of time in the course of the interview.  While the grand jury should have been told that Plaintiff did not *tell* Defendant Sanchez he picked up D.W. in "an extremely rough manner," the Court finds that no reasonable juror would consider this oversight to have misled the grand jury, or to have any relevance to the question of whether there was probable cause for the original arrest.

B.     Plaintiff's Interview Statements Were not Coerced

Plaintiff contends that Plaintiff's statements were made in response to Defendant Sanchez' misrepresentations and coercive remarks, and thus cannot be considered sufficiently voluntary to form the basis for probable cause for an arrest warrant.   For example, Plaintiff argues that Defendant was lying about doctors needing to have information about how D.W. was injured in order to help them treat him.  Defendant told Plaintiff that "we need to know what happened in that short period of time" and that if he admitted "the kid [fell] on his head" or the "kid was shaken," doctors would be in a better position to save D.W.'s life.  Ex. 2 at 34:1-10.  Defendant also told Plaintiff:

10

> The ribs being broken, the bleeding around the brain . . . let's give that little guy a fighting chance. 'Cause if we walk out of this room and someone tells me this is what I did, that gives the doctors a little more to work with. They can say, this is what happened to this child; let's do what we have to do. Do we go in and do surgery on the brain; do we do this?

Ex. 2 at 32:1-11.

Plaintiff also claims that during the interview, Defendant Sanchez also told Plaintiff more than once, that Plaintiff's story and D.W.'s injuries were not consistent. In addition, Defendant lied about the medical information he had concerning D.W.'s injuries. Knowing that D.W.'s injuries had been determined by the medical providers to be old injuries, Defendant Sanchez misrepresented to Plaintiff that some of the rib fractures were recent enough to be caused that evening, thus causing Plaintiff's admissions about possibly causing the fractures to be false.

The Court has viewed the entire DVD of Defendant's interview of Plaintiff, and concludes that there is no suggestion whatsoever that Defendant's statements were so coercive so as to render Plaintiff's statements involuntary or forced. A statement to law enforcement is involuntary when the government obtained the statements by physical or psychological coercion or by improper inducement "so that the suspect's will was overborne." *United States v. Erving L.*, 147 F.3d 1240, 1248-49 (10th Cir. 1998)); *Rex v. Teeples*, 753 F.2d 840, 843 (10th Cir. 1985) ("Extracting an involuntary confession by coercion is a due process violation. This is so notwithstanding the coercion is psychological rather than physical."). The Court recognizes that there are situations where promises and statements may be made during a police interview or interrogation which are "sufficiently compelling and linked to the confession" so that it can be said that an individual's will was "overcome by the offer," as in a promise of leniency, for example.[7] *See, e.g., Clanton v. Cooper,* 129 F.3d 1147, 1159 (10th Cir. 1997). Nothing of the

---

[7] No promise of leniency was every suggested in this case. In fact, Defendant Sanchez was careful to tell Plaintiff that there would be "consequences" to what Plaintiff admitted to.

11

sort happened here.  First, Plaintiff offers no evidence that the Presbyterian doctors did *not* need this information in order to develop a treatment plan for the infant.  Second, it is not clear that Defendant misrepresented the medical information he relayed to Plaintiff (see discussion below). Third, even if these statements were false, no reasonable juror would consider them sufficiently coercive to affect the voluntary nature of Plaintiff's statements and admissions during the interview.

Accordingly, the Court finds that Plaintiff's statements during the interview were not coerced as a result of statements, or the nature of the statements, made by Defendant Sanchez.

C.       Alleged Misrepresentations of Medical Evidence

The parties do not agree about the exact nature of the medical information possessed by Defendant Sanchez at the time he interviewed Plaintiff.  Plaintiff contends that he would not have been before a grand jury had Defendant Sanchez not filed an affidavit for an arrest warrant that contained misinformation and which omitted exculpatory evidence available to Mr. Sanchez concerning the medical evidence.  Plaintiff claims that Defendant Sanchez made false statements in the course of the interview which were inconsistent with the medical evidence.  According to Plaintiff, the medical evidence (the "exculpatory evidence") showed that D.W.'s injuries could not have occurred in the short time between when Plaintiff arrived home and when the ambulance arrived, and thus would have vitiated probable cause.  Doc. 38 at 3.   Plaintiff argues that, as a result of Defendant's false statements, any of his statements about his actions hurting the baby were not true and could not be used as the basis for Defendant's warrant affidavit.

Under 42 U.S.C. § 1983, a law enforcement officer may violate the Fourth Amendment if he or she knowingly or recklessly omits information from an arrest affidavit which, if included, would have vitiated probable cause.  *Taylor v. Meacham*, 82 F.3d 1556, 1562-64 (10th Cir. 1996); *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir.1996) (same).  Probable cause must be

12

evaluated as of the events in question. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1294 (10th Cir. 2004). Defendant Sanchez' arrest warrant affidavit states in part:

> A seven-week old infant was taken to the Presbyterian Hospital and sustained numerous injuries consistent with child abuse.[8] I spoke with the attending physician who stated the seven-week old infant sustained three rib fractures which likely occurred within this past twenty-four hours and also sustained two rib fractures which likely occurred within the past seven to ten days. The infant also had subdural hematoma, brain swelling and retinal hemorrhages.

Ex. A. Plaintiff argues that the only medical evidence Defendant possessed at the time Defendant charged him with child abuse was the information he received from the attending physician, Dr. Shannon and Mary Dentz, a pediatric intensive care ("PICU") nurse, both of were identified by Defendant as his sources of information regarding D.W.'s injuries.[9] Plaintiff points out that both Dr. Shannon and Ms. Dentz stated in their interviews that the infant's injuries had been caused *prior* to September 3, 2006, and that the infant's rib fractures were not responsible for his admission. Ex. 5 at 19-20; Ex. 7 at 4. Both also stated that the subdural hematoma did not happen within twenty-four hours of D.W.'s admission. Ex. 5 at 17:14-16; Ex. 6 at 6:9-13. At Plaintiff's criminal trial, Dr. Shannon stated that none of the events that occurred on the evening of September 3, 2006 could have caused D.W.'s injuries. Ex. 5 at 20:8-10. Ms. Dentz' report stated that the rib fractures were greater than seven to ten days old, based on the amount of healing seen on the x-ray. She also stated in the report that the "older" subdural hematoma could explain "the fussiness and difficulty feeding that [D.W.] had over the past several weeks," but was not responsible for his condition on admission to Presbyterian Hospital

---

[8] The warrant affidavit/criminal complaint charges Plaintiff with the crime of child abuse under NMSA 1978, § 30-6-1. Ex. A. Abuse of a child consists of a person knowingly, intentionally, or negligently, and without justifiable cause, causing or permitting a child to be: (1) placed in a situation that may endanger the child's life or health; (2) tortured, cruelly confined or cruelly punished; or (3) exposed to the inclemency of the weather.

[9] Both sides accept Defendant's representation that Dr. Shannon or Ms. Dentz were the sources of the medical information given to Defendant on September 3, 2006. *See* Doc. 38 at 3. However, neither party offers an affidavit from either individual stating exactly what was told to Defendant on that evening.

on September 3, 2006.  Ex. 7 at 4.  Thus, Plaintiff contends that Defendant Sanchez misrepresented the medical information he included in his affidavit.

     Defendant relies on the trial testimony of Dr, Sean Mullen, the radiologist who reviewed the initial x-ray taken on the night of D.W.'s admission, and who opined that the callous formation on the most recent fracture indicated that it was less than seven days old and that it could even be hours old.  Ex. C at 8:9-16.  Also, Dr. Elliott Crow, a board certified pediatric physician who worked in the PICU and treated D.W., testified that "there was likely new blood which would also correlate with [D.W.'s] clinical picture because he essentially collapsed and stopped breathing. . . So we knew that there was a fresh injury but didn't know as convincingly if there was old blood as well." Ex. D at 79:9-18.

     Both parties challenge the admissibility of the medical evidence of the other side. Plaintiff challenges the testimony of Dr. Mullen and Dr. Crow on the basis that their testimony, given during Plaintiff's trial in the underlying criminal case, was not available to Defendant Sanchez on the evening of September 3, 2006 when he interviewed Plaintiff, or on September 4, 2006, when he executed an arrest warrant affidavit.  In turn, Defendant objects to the use of the statements of Dr. Shannon and Ms. Dentz which come from unsworn witness interview statements, and which are therefore inadmissible.  Defendant also finds it ironic—as does the Court—that Plaintiff relies on interview testimony by Dr. Shannon and Ms. Dentz which was as unavailable to Defendant when he charged Plaintiff with child abuse as was the trial testimony of Drs. Mullen and Crow.

     The Court has also considered both parties' objections to the medical evidence and testimony.  As a general rule, the content of evidence used for purposes of summary judgment must be admissible.  *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). However, parties may submit evidence in support of summary judgment which initially would be

14

inadmissible in form (such as affidavits, which would be inadmissible at trial as hearsay), as long as such evidence may ultimately be presented at trial in an admissible form.  It is "the content of substance of the evidence" that must be admissible.  *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995).   In this case, it is undisputed that Defendant Sanchez obtained information from the medical providers, including Dr. Shannon, before conducting the police interview of Plaintiff.  It is also undisputed that Drs. Shannon, Mullen and Crow, and Ms. Dentz, were all involved in treating D.W. on the night he was admitted to Presbyterian Hospital.  Thus, while the testimony of Dr. Mullen and Dr. Crow was given at the criminal trial two years after Plaintiff was arrested, and the statements of Dr. Shannon and Ms. Dentz were part of an unsworn witness interview, all of these statements were based on personal knowledge obtained by treating D.W.'s injuries when the infant was admitted.   Therefore, the Court considers the unsworn witness statements of Dr. Shannon and Ms. Dentz, as well as the criminal trial testimony of Dr. Mullen and Dr. Crow, testimony and statements of Drs. Shannon Mullen, Crow as admissible in its content and substance for purposes of this summary judgment motion.

   Based on the Court's review of all of the medical evidence and testimony presented, there appears to have been a consensus among the medical providers that the initial conclusion on D.W.'s admittance to the hospital was that there were both old and new fractures. Ex. C  (Mullen Trial Testimony), and that there was a "fresh injury."  Ex. D (Crow Trial Testimony) at 79:9-18).  While Dr. Shannon testified later at Plaintiff's trial that none of the events that occurred on September 3, 2006 caused D.W.'s injuries, such testimony must be viewed (as Plaintiff himself urges) from the vantage point of the information that was available that evening, and not two years afterward, when all the medical information had been collected, analyzed and had settled.  Dr. Shannon's testimony at the same trial indicates that the initial impression was that some of the fractures were recent, and that there was a lack of uncertainty about the age of the injuries:

15

> Well, I believe one of the initial radiology records on the chest x-ray showed—may have said something about old and new fractures, but I think when we did the skeletal survey, which was a more extensive x-ray of all the bones in the body, after they did the CT scan, before we proceeded to the PICU, the reading on that is that they were of callus formation, which looks while. We look through the actual extent of the x-rays which shows where the bone hearing is starting—had started to take place [sic].

Ex. B (Shannon Trial Testimony) at 66:25-67:7.

In addition, the "Impression" section of Ms. Dentz' report stated that D.W. had "Bilateral subdural hematomas of varying ages (old and new). . . ." Ex. 7 at 4. She also testified under oath at the grand jury that: "The acute injuries that [D.W.] had—the most significant one was a severe brain trauma, a severe trauma to the brain with a resulting in [sic] the subdural hematoma. Ex. E at 19:16-18. She also referred to the bleeding in the brain as "shearing forces" which can result from nerves being hurt very severely and very quickly. Ex. E at 20:24-25 (grand jury testimony); Ex. B (trial testimony) at 75:5-76:2. This testimony essentially did not rule out that an acute injury in the form of a new brain trauma (the "new" injury) may have been responsible for D.W.'s presenting injuries.

D.   Court's Findings on Medical Evidence and Arrest Warrant Affidavit Statements

After reviewing the considerable medical evidence presented by the parties, the Court finds that what becomes clear is the *lack* of clarity regarding the exact causes of D.W.'s presenting injuries on September 3, 2006. Plaintiff has not created a material factual dispute suggesting that Defendant Sanchez lied to Plaintiff about the status of D.W.'s injuries or the cause of his injuries, because Plaintiff's own evidence indicates an initial conclusion by the medical providers that both old and new injuries existed. No reasonable fact finder would conclude that Defendant Sanchez' statements on the arrest warrant affidavit concerning were misrepresentations or omissions of what he was informed by the attending physician. The affidavit stated that D.W. "had subdural

16

hematoma [sic]", and two rib fractures that occurred within the past seven to ten days, which is consistent with the medical evidence submitted by Plaintiff. Defendant's statement concerning the three rib fractures which had occurred within the past twenty-four hours was not inconsistent with the lack of specific medical and radiologic findings that initially suggested "new" or "fresh" injuries. Thus, the arrest warrant that issued was not based on false statements, omissions, or exculpatory evidence.

Moreover, there is no possibility of considering any of this medical evidence or testimony as "exculpatory evidence." It is undisputed that D.W. presented to the hospital with injuries consistent with child abuse, and the medical providers who examined D.W. suspected that child abuse had possibly occurred. Ex. 5 at 3:4-14; Ex. 6 at 1:1-20. The Court agrees with Defendant (Doc. 44 at 15) that the *age* of these injuries is ultimately immaterial to the question of whether probable cause existed for the issuance of the arrest warrant. Viewing all of the supported and material facts favorably to Plaintiff, the Court finds that D.W.'s existing injuries (even if they were old injuries) together with Plaintiff's voluntary statements in the police interview, constituted a sufficient basis for Defendant's statements of the arrest warrant affidavit, and in turn for the arrest warrant.[10]

Regardless of the age of the previous injuries sustained by D.W., it is clear that something happened to D.W. on September 3, 2006 which made him stop breathing and required him to be taken to Presbyterian Hospital. At that point, Defendant Sanchez did not require proof either that Plaintiff was responsible for the injuries or that Anne White was *not* responsible. All that was required was a "substantial probability that a crime has

---

[10] Certainly, Plaintiff cannot challenge his own statements about being taken out of context. The Court has rejected Plaintiff's challenges to his statements as being coerced, but the Court has rejected those arguments. *See, e.g., Scott v. Harris*, 550 U.S. 372, 379-380 (2007) (in considering deputy's motion for summary judgment, courts had to view the facts in the light depicted by videotape which captured events underlying excessive force claim).

been committed and that a specific individual committed a crime." *See St. John v. Justman*, 771 F.2d 445, 448 (10th Cir. 1985).   Because there is no material fact suggesting that probable cause did not exist, Plaintiff cannot satisfy all the elements of a malicious prosecution claim under § 1983.  Thus, Defendant is entitled to summary judgment on Plaintiff's claim of malicious prosecution.

## CONCLUSION

In sum, I find and conclude that Defendant is entitled to summary judgment on Plaintiff's sole claim in this lawsuit.  The law regarding malicious prosecution under the Fourth Amendment was clearly established at the relevant time so that Defendant would have known that misrepresenting evidence or omitting exculpatory evidence on an arrest warrant affidavit would violate an individual's Fourth Amendment rights.

As noted previously, the material facts in this case are not disputed, but the parties differ on the legal significance of those facts.   The Court makes the following findings and conclusions, viewing the supported and material facts favorably to Plaintiff:

- Plaintiff's statements to Defendant Sanchez during the police interview were voluntary and not the result of coercion.  As a matter of law, Defendant's statements and questions to Plaintiff were not misrepresentations of the medical evidence or otherwise coercive to rise to the level of being "sufficiently compelling and linked to the confession" so as to render Plaintiff's statements involuntary;

- No reasonable fact finder would conclude that Defendant Sanchez' statements on the arrest warrant affidavit were misrepresentations or omissions of the medical information he obtained from medical providers on September 3, 2006.  Viewing the evidence favorably to Plaintiff, D.W. had sustained both old and new injuries, and the initial medical impression was unclear as to exact age of all of the injuries.  In addition, any reference made by Defendant to the age of the rib fractures was not inconsistent with the information available at the time he arrested Plaintiff;

- The Court further finds that the medical evidence regarding the *age* of D.W.'s injuries are not necessary, and therefore not relevant, to the question of whether Defendant had sufficient information to constitute probable cause to arrest Plaintiff.  The existence of D.W.'s injuries, regardless of the age of the injuries, together with Plaintiff's statements

made to Defendant Sanchez during the police interview, constituted probable cause for an arrest for child abuse;

- No reasonable fact finder would consider Defendant Sanchez' statement to the grand jury that Plaintiff picked up D.W. in "an extremely rough manner" to have misled the grand jury into indicting Plaintiff.  The Court also finds and concludes that this oversight, which is essentially an accurate paraphrasing of Plaintiff's own statements during the interview, has no relevance to the question of whether there was probable cause for Plaintiff's arrest.

**THEREFORE,**

**IT IS ORDERED** that Defendant Brian Sanchez' Second Motion for Summary Judgment **(Doc. 34)** is hereby GRANTED for reasons described in this Memorandum Opinion and Order.   A Rule 58  Judgment shall be entered separately.

_____
UNITED STATES DISTRICT JUDGE